S. Samuel Di Falco, S.
The Public Administrator, as administrator of the estate of Bogomir Hirsl, instituted this discovery proceeding to recover the sum of approximately $38,000 and other property allegedly owned by the decedent and in the possession of Roman Smucer. The amended answer of the respondent denies the material allegations of the petition, and, for an affirmative defense, alleges that respondent has title to to all of the property described in the petition. At the beginning of the hearing the court was advised that the moneys were taken from bank accounts originally in the name of Lela Podvinec, daughter of Bogomir Hirsl, or in their joint names, that she died leaving a will in which her father was named sole legatee, that respondent was executor under her will, and that this proceeding was brought at the request of respondent in order to settle the questions at issue between the two estates. It was then stipulated that the ‘ ‘ determination of the issues in this case will also be binding upon the decedent’s daughter’s estate Lela Podvinec ”, although no proceeding in her estate was then pending. However, the executor of her will (who is also the claimant) and the administrator of the estate of the sole legatee are before the court, and the rights and interests of no other persons are involved.
Lela Podvinec, nee Hirsl, died June 21, 1963. Her father, Bogomir Hirsl, a man past 90 years of age, died eight days later. The father and daughter, together with Roman Smucer, the respondent, and the principal witness for respondent, Lea Frank, had formerly been residents of the same community in Yugoslavia, and had known each other for many years. Lela Podvinec came to the United States with her parents in 1948 or 1949, and shortly afterwards she entered the employ of the respondent. Her father was said, to have been “ close to 80 ” *725 when he came here, and he was never employed. Mrs. Podvinec continued to be employed by respondent until the time of her final illness and death. The witness, Lea Frank, was a fellow employee of Lela, having been employed by respondent for an even longer period of time than Lela.
In May, 1963, Lela Podvinec was gravely ill, suffering from advanced carcinoma. She was aware of her condition and discussed it with the witness. Toward the latter part of that month, Miss Frank and Mr. Smucer, who had been in the habit of visiting her regularly, paid a visit at her home. On that day, according to the testimony of Miss Frank, Lela Podvinec asked that a box on her desk be brought to her, and when she received it, she gave it to respondent saying, “ This is yours, Roman ”. On cross-examination, the witness expressed it differently, namely, “Roman, here is the box with the bankbooks.” The witness did not then know the contents of the box, but saw it next day in respondent’s possession. The witness could not say how many bankbooks were in the box on the day that it was delivered to respondent in May, 1963. Although she did see the contents of the box on the following day, she could not remember the particulars. However, all of the sums on deposit were withdrawn before Lela’s death, and all of the bank records are in evidence.
Miss Frank testified that during the next few days she obtained withdrawal slips from the various savings banks and from the commercial bank in which there was a savings account. These slips were prepared and brought by her to Lela Podvinec. Lela signed the withdrawal slips, Miss Frank presented them at the respective banks, obtained a check for the entire sum on deposit, and deposited the checks in bank accounts of the respondent. For some reason not explained on the record, these deposits were made in separate special accounts, a separate account being opened for each account that was closed. These accounts were in the joint names of respondent Smucer and the witness Frank, but her name was added only for convenience in making withdrawals. She stated that she had no personal interest whatever in any of the accounts. We may therefore regard the funds as in effect being deposited in separate accounts of the respondent.
In respect of the withdrawals from the savings accounts, the witness testified that she “ brought to Lola withdrawal slips from each of the saving banks, and Lela asked Mr. Smucer and me to withdraw all the money and to put it into Mr. Smucer’s name. And she told me that she gave it to Mr. Roman Smucer.” Each and every slip was signed by Lela in the presence of the *726 witness. There seems to be no doubt that each withdrawal slip bears the genuine signature of Lela Podvinec.
There were four joint accounts in the names of Lela Podvinec and Bogomir Hirsl in the following banks: Chase Manhattan Bank, compound interest account; $4,078.13; the Bank for Savings, $3,838.44; Central Savings Bank, $4,643.09; East River Savings Bank, $4,604.38. The entire sums on deposit in the first two banks were withdrawn on May 29. Two days later, the entire deposits in the other two were withdrawn. On the basis of the testimony of Miss Frank, all of the withdrawal slips were freely and voluntarily signed by Lela Podvinec and all of the moneys were deposited in respondent’s accounts during her lifetime.
In addition to these joint accounts, there were three separate accounts in the name of Lela Podvinec in trust for a third person, with total deposits in excess of $12,000. These' accounts were in like manner closed by withdrawals signed by Lela Podvinec, and all of the moneys were deposited in respondent’s accounts. Lela owned various shares of stock which were in the custody of her brokers. These shares were sold, a check in the sum of $9,014.92 was made payable to Mrs. Podvinec, was indorsed by her and was deposited in respondent’s account.
Lela Podvinec and her father had a joint checking account in a commercial bank. On May 28,1963, she executed separate powers of attorney to Lea Frank and to respondent and on June 5, 1963, her father executed similar instruments. Acting under the Podvinec power of attorney, Miss Frank drew two checks, one on May 29 in the sum of $9,000, the other on June 13 in the sum of $600. Both checks were to the order of Roman Smueer or Lea Frank, and both checks were deposited in a special account in their joint names. The account was owned solely by the respondent.
The Totten Trust accounts and the proceeds of the sale of the securities present little difficulty insofar as this record shows. The beneficiary of the trust accounts did not acquire any vested interest and there was no legal obstacle to the depositor’s transfer of all the deposits. She signed all the withdrawal slips and in the case of a check payable to her, indorsed the check. She acted without coercion, and she acted effectively to transfer all of the funds to the respondent. The gifts were completed during her lifetime. Lela Podvinec apparently had no close relative except her father. He was of very advanced age and was in a nursing home. She had exacted a promise from respondent that her father would be cared for. She said: “ Take care of father * * * Take care of father *727 and you will take care of everything. ’ ’ He replied: “ I will take care.” That promise, insofar as this record shows, was not intended to defeat or limit the transfer of funds. There is no basis in the record to support the finding that the gifts were made in trust and not absolutely. The evidence indicates rather an intent to transfer the property to the respondent. The long period of their acquaintance and the close business relationship over a long period of years perhaps gave her confidence that the respondent would see that her father was cared for during the remainder of his lifetime. If Mrs. Podvinec and the respondent ever had any other discussions relating to the use of the money after her father’s death, there is no evidence whatever in the record.
The court therefore holds that the proceeds of the sale of the securities and the proceeds of the three Totten Trust accounts belong to the respondent.
With respect to the joint accounts, the evidence indicates an intent and purpose on the part of Mrs. Podvinec to transfer the sums on deposit in these accounts to the respondent. However, these accounts were in the joint names of her father and herself. The law governing ownership of joint deposits was modified by chapter 157 of the Laws of 1964 (Banking Law, § 675). That change is not significant insofar as the present controversy is concerned. The prior rule governing savings bank accounts was that when an account was “ opened in the form prescribed by statute (Banking Law, § 249 [now § 239], subd. 3), a presumption at once arises that the interest of the depositors is that of joint tenants. Upon the death of one of the depositors, this presumption becomes conclusive in favor of the survivor in respect of any moneys then left in the account. It continues to be a mere presumption in respect of any moneys previously withdrawn.” (Marrow v. Moskowitz, 255 N. Y. 219, 221; Matter of Porianda, 256 N. Y. 423, 426.) In respect of joint deposits in commercial banks, both the old rule and the new rule gave to the form of the account a presumption that was and still is rebuttable (Banking Law, § 134, subd. 3; repealed by L. 1964, ch. 157). In recommending the 1964 legislation, the Commission on the Law of Estates recommended also “That the rebuttable presumption rule concerning moneys withdrawn during the joint lives of the co-tenants remain unchanged.” (Third Report of Temporary State Comm, on Law of Estates, p. [972] 384.)
Thus the form of each of the joint accounts gave rise to the presumption that the interest of the depositors was that of joint tenants. All of the moneys were withdrawn by Lela Podvinec *728 during her lifetime. The presumption of joint ownership is a rebuttable one. However, no evidence sufficient to overcome that presumption was adduced. An effort was made to show that the moneys on deposit must have belonged originally to Lela. Miss Frank was asked whether Lela was supporting her parents, and she said: “Yes, definitely, both her father and mother.” In reply to other questions, she testified that Lela’s father “never worked”. However, the bank records which are in evidence give no indication that Lela was ever the sole owner of any of the accounts, except, perhaps, the Central Savings Bank account which affords some basis for the inference that the account might have originally stood in Lela’s name alone. Otherwise there is nothing in the entire record to indicate whether Lela or her father was the original depositor or the maker of any one of the many deposits. The father, as well as the daughter is authorized to sign withdrawals. On one account his name is listed first. The records indicate that two of the accounts were opened as early as 1953 and the others appear to have been opened in 1958 and 1959. The testimony of Miss Frank is wholly insufficient to overcome the presumption that arose from the form of the accounts. There is no indication that either of the joint owners ever intended otherwise. Each acquired a present interest in the joint deposits.
The fact that' Lela Podvinec made an attempt to transfer all of the deposits to the respondent is, of course, a fact to consider. In Walsh v. Keenan (293 N. Y. 573, 579), the transfer of the full amount was only one of the facts that led the court to decide that the presumption of joint ownership was rebutted. The effort to transfer the entire deposit might have been a corroborating circumstance if other evidence had been offered to show that by the agreement of the depositors the tenancy in its inception did not accord with the presumption. ‘ ‘ A corroborating circumstance is worthless when there is nothing to corroborate.” (Cabdozo, Ch. J., Marrow v. Moskowitz, supra, p. 222.)
The question then is whether the Hirsl estate is entitled to recover the entire sums on deposit in the four joint savings accounts or only one half that sum. The Court of Appeals has said that the “ incident of the right of survivorship is a characteristic of joint tenancy but a joint tenancy may be terminated or severed before such right accrues by the act of either joint tenant. A joint tenant, as an incident to his tenure, may always terminate the joint tenancy by transfer or conveyance of his interest. * * * Decedent and claimant each had the right as a joint owner of the bank deposit to withdraw a moiety or *729 less than a moiety for her own use and thus destroy the joint tenancy as to such withdrawals. Joint ownership of a bank deposit does not differ from any other joint oivnership. Nothing in the Banking Law prevents one joint owner from destroying the joint ownership in the entire deposit to the extent of his withdrawals of no more than his equal share for his own use, although if the entire account had been withdrawn the result might hm>e been otherwise.” (Matter of Suter, 258 N. Y. 104, 106; emphasis added.) The concluding words in the opinion refer to the decision in Marrow v. Moskowitz (255 N. Y. 219). In that case one depositor had withdrawn the entire sum on deposit and placed it in a new account in her own name. The surviving depositor sued the executors of the deceased depositor, and recovered a judgment for the entire sum. “ The withdrawal ”, said the Court of Appeals, “ did not destroy the joint tenancy or the title of the survivor, if a joint tenancy had been created” (pp. 221-222). The Report of the Commission on the Law of Estates views the Suter opinion as having “ perpetrated the confusion” (p. [960] 372) and as somewhat in conflict with the holding in the Marrow case. (Marrow v. Moskowitz, supra, p. 221.) However, the emphasized words indicate very clearly that even if the opinion had some reservations on that issue, it was not attempting to ignore the rule applied in the Marrow case.
It seems to the court that the decisive factor is not whether the one joint depositor has withdrawn only his one-half share or less than one half or has, on the other hand, withdrawn the whole sum. If either depositor took more than he had a right to take, he should ordinarily be accountable to his joint tenant only for the excess. The decisive factor, in the opinion of the court, is whether the deposit was still in existence as a deposit at the time of the death of the first depositor to die, and whether the one had sought to change the form of the entire deposit rather than merely to withdraw his own share. In Marrow v. Moskowitz, the deceased depositor had withdrawn the entire fund from the joint account and had deposited the entire sum in the same bank in an account in her name alone. In that case the Appellate Division had pointed out that it “ must be borne in mind * * * that no money whatever was withdrawn by either party and that it was the same money which had been placed in the joint account which was afterwards deposited in the name of Fannie Manheimer.” The court went on to say: The fact that Fannie Manheimer took the deposit out of the joint account and put it in her own name in another account, can in no wise affect the title of the other joint owner, there *730 being no consent by that joint owner to the change in the account.” (230 App. Div. 1, 4-5.) In other words, the deposit was still in the bank, the depositor having attempted to change its form. The deceased depositor in the Buter case had withdrawn less than her moiety. There was no proof of what was done with the moneys that were withdrawn from the joint account, The surviving depositor was held to have no right to recover the amount of the withdrawals from the estate of the deceased joint tenant. The intimation in the opinion that the conclusion might have been different if the entire sum had been withdrawn, was not, therefore, predicated upon any particular factual situation, but was merely an advertence to the rule of the earlier case.
In the present case, the withdrawals from two of the joint accounts were made on withdrawal slips payable to the order of the Chase Manhattan Bank. In the case of each of the three savings banks, a bank check was issued, payable to the order of the Chase Manhattan Bank. The fourth account was in the Chase Manhattan Bank and the deposit in a special account in the same bank was accomplished by indorsement on the withdrawal slip. As stated hereinabove, respondent’s own witness testified that these special accounts “were new checking accounts opened with each withdrawal from the savings account. * * * Each withdrawal * * * a separate checking account. A separate checking account was made, each item being kept separately.” There was a suggestion by counsel that these separate accounts were only conduits and that finally respondent placed- all moneys in his own account, but there is no indication when that was done, and it could hardly have been done during Lela’s lifetime.
Thus, we have, as in Marrow v. Moskowitz (supra), a change in the form of these four accounts but a retention of each separate account in a new bank under a new name. Lela Podvinec simply attempted to change the ownership of the account. That she could not do. One of the incidents of the joint account was the right of survivorship of her father. She was powerless to destroy that right.
The court, therefore, holds that the respondent must turn over to the petitioner an amount equal to the total sums withdrawn from the four joint accounts.
The checking account, over which Lela had given powers of attorney, was also a joint account. However, there is an additional reason for holding respondent responsible for the sums withdrawn from that, account. The respondent was not permitted to testify to transactions with the deceased depositor. *731 All of the testimony on his behalf was given by his employee, Miss Frank. She was asked what conversation she had with Lela Podvinec with respect to withdrawals of money from that account. Her answer was: ‘ ‘ Well, she said, 1 All my money that I have, I have given to Roman ’, because she called him Roman.” At a later point in the examination she was asked to state the conversation with Mrs. Podvinec, and she answered: “ She wants me to have the signature on her checking account.” In reply to the question whether she said why she wanted the witness to have that power, the witness said:“ Because she was sick, because she was going to die, and she wants me to assist also Mr. Smucer in taking care of everything.” Again she was asked the purpose of the power of attorney and whether or not it was to take care of her and her father and the witness replied: “Yes, if necessary, if need be, that some funds have to be disbursed * * * but if Mr. Smucer would not be in New York and funds would have to be dispensed, I had for that reason the power of attorney, to be able to act on behalf of Mr. Smucer.” The witness further testified that she drew the two checks, totaling $9,600, and that the two checks were deposited in the special account in her name and in the name of Mr. Smucer.
It is significant that in every other case, Lela Podvinec signed Avithdrawal slips and indorsed checks, but that in this case the transfer of funds Avas made by the attorney in fact. There is no explanation why the decedent herself did not sign these checks. The Avitness had testified that the purpose of the power of attorney was to disburse funds “ to take care of her and to take care of her father”, and, if necessary, to disburse funds. Yet on the very day after the execution of the power of attorney, the witness dreAV a check in the sum of $9,000 to her OAvn order and that of Roman Smucer. If the intent of the depositor had been to transfer the funds immediately, it would have been easier to have had the depositor sign a cheek rather than to execute and acknowledge the poAver of attorney. The testimony of the respondent’s own witness clearly shows that the account Avas to be disbursed as needed. Mrs Podvinec was still alive and in need of care. So, too, Avas her father. This was the only account still in their names. The authority to use the moneys as needed for the care of both is not the equivalent of authority to take it unto himself. On all of the evidence, the court holds that the witness had no authority to so disburse the fund and the respondent had no right to receive it. The same is true with respect of the second check of $600 which was drawn on June 13, eight days prior to the death of the depositor.
*732 The checking account was a joint account in the name of Lela and her father. The funds were improperly withdrawn from that account, except to the extent necessary to defray the expenses of Mrs. Podvinec or the decedent Hirsl. The respondent will therefore be directed to deliver to the petitioner the sum of $9,600, after deducting therefrom any disbursements made for the care of either of the deceased depositors. The respondent is directed to file an affidavit setting forth the disbursements and the particulars relating to each disbursement. If the parties cannot agree on the total allowable disbursements the matter will be set for further hearing.
There was some testimony relating to the jewelry of Lela Podvinec and to its present possession by the respondent, who is the executor under her will. However, an issue of the ownership of such jewelry was not properly formulated and the evidence was not sufficient to enable the court to make any decision thereon. The question of ownership, if any such question exists, can be presented in the accounting of her executor.